## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-CV-0476-C-BH** |
| | § | |
| **SMART ILESANMI AJAYI,** | § | |
| **individually and doing business as,** | § | |
| **HARPLET MARKETING, LLC,** | § | |
| **TOPPS TAX SERVICES, and** | § | |
| **SMART TAX SERVICES,** | § | |
| **and JOANN VILLARREAL, HARPLET** | § | |
| | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge**[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Before the Court for recommendation are the plaintiff's *Motion for Order for Defendant Smart Ilesanmi Ajayi to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the Court's Injunction Order (ECF 22)*, filed June 9, 2020 (doc. 26), and *Motion for Order for Defendant Smart Ilesanmi Ajayi to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the Court's Injunction Orders (ECF 18, 22)*, filed November 19, 2020 (doc. 42). Based on the relevant filings, evidence, oral argument, and applicable law, the motions should be **DENIED**.

## I. BACKGROUND

On February 25, 2019, the United States of America (Plaintiff) brought this civil action for permanent injunction under sections 7402(a), 7407, and 7408 of the Internal Revenue Code against

---

[1]By *Order* dated December 14, 2020 (doc. 51), this case has been referred for full case management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on the civil contempt issue raised in this case.

Smart Ilesanmi Ajayi, individually and doing business as Harplet Marketing, LLC (Harplet), Topps Tax Services (Topps Tax), and Smart Tax Services (Smart Tax) (collectively Defendant) and JoAnn Villarreal. (*See* doc. 1.) It alleged that Defendant and Villarreal had violated internal revenue laws by, among other things, preparing tax returns which understated their customers' tax liabilities by fabricating or inflating (i) deductions on Schedule A (Itemized Deductions) in the form of noncash charitable deductions, and (ii) businesses losses on Schedule C (Profit or Loss from Business). (*Id.* at 3.)[2]  The parties stipulated to the entry of a preliminary injunction against Defendant and Villarreal, and the district court issued an Order for Preliminary Injunction (October 2019 Order) on October 10, 2019, which would be effective October 31, 2019. (*See* docs. 16, 18.)

The October 2019 Order enjoins Defendant and Villarreal from "acting as a federal tax return preparer and assisting in, advising, or directing the preparation or filing of federal tax returns, amended returns, or any other federal tax documents or forms for any person or entity other than themselves, and owning, operating, managing, working in, controlling, licensing, consulting with, or franchising a tax return preparation business;" orders them to "close and not re-open, without further order from the Court, all tax return preparation stores that they own directly or through any entity, and whether those stores do business as Harplet Marketing, LLC, Topps Tax Services, and Smart Tax Services, or under any other name," by no later than October 31, 2019; and prohibits them from "assigning, transferring, or selling any franchise agreement, independent contractor agreement, or employment contract related to Harplet Marketing, LLC, Topps Tax Services, and Smart Tax Services, or any other tax return preparation business to which he or any entity under their control is a party." (*Id.* at 1-2.) It does not prohibit them from

---

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

"consulting and communicating with former customers about tax returns that were prepared prior to filing of this suit." (*Id.*)

On March 23, 2020, the district court issued the Stipulated Order for Permanent Injunction (March 2020 Order),[3] which permanently enjoins Defendant from, "directly or indirectly":

i.      Acting as federal tax return preparer by preparing or filing, or assisting in the preparation or filing of any federal tax returns for any other person or entity, either individually or through an entity, inclusive of Harplett[sic] Marketing LLC., Smart Tax Services, and Topps Tax Services, including their offices located at 692 West Pioneer Parkway, Suite 120, Grand Prairie, TX 75051, 1038 North Canier Parkway, Grand Prairie, TX 75050, and 2208 South Fielder Road, Suite # 108, Arlington. TX 76013 except that she[sic] may prepare and file his own tax returns;

ii.     Assisting or advising anyone in connection with any tax matter;

iii.    Having an ownership interest in or working for (either as an employee or independent contractor) any entity that prepares tax returns or represents clients before the Internal Revenue Service;

iv.     Organizing or selling plans or arrangements that advise or encourage taxpayers to attempt to evade the assessment or collection of their correct federal tax;

v.      Engaging in any other activity subject to penalty under I.R.C. §§ 6694,6695, 6700, or 6701;

vi.     Engaging in conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws and from promoting any false tax scheme; and

vii.    Representing anyone before the IRS.

(doc. 22 at 3.) It also provides that Defendant shall contact "all persons for whom he prepared federal tax returns or claims for a refund during 2017, 2018 and 2019 (tax returns for 2016-l8 tax years), to inform them of the permanent injunction entered against him" within thirty days of the

---

[3]A similar stipulated order for permanent injunction against Villarreal was separately entered on the same day. (*See* doc. 21.)

order, and provide Plaintiff's counsel "a sworn certificate stating that he has complied with this requirement" within 45 days. (*Id.* at 4.)[4] The Court retained jurisdiction to enforce the injunction, which also specifically provided that Plaintiff was permitted to engage in post-judgment discovery to ensure compliance with it. (*Id.* at 4-5.)

On April 6, 2020 (doc. 25), Plaintiff moved for an order to show cause against Defendant to show why he should not be held in civil contempt for violating the March 2020 Order, as well as the terms of the October 2019 Order on June 9, 2020. (doc. 26.) Defendant responded on June 18, 2020, and Plaintiff replied on July 20, 2020. (docs. 28, 30.) Plaintiff filed a second motion for order to show cause to provide additional grounds for Defendant's violation of both orders on November 19, 2020. (doc. 42.) Defendant responded on December 10, 2020, and Plaintiff replied on December 17, 2020. (docs. 48, 56.)

On February 25, 2021, an evidentiary hearing was conducted by video conference. (*See* doc. 92.) Separate exhibits totaling over 1,500 pages were admitted, and testimony from a total of six witnesses, including Defendant, was presented. (*See* doc. 93.) On March 26, 2021, both parties filed proposed findings of fact and conclusions of law. (docs. 95, 96.)

After consideration of the testimony and evidence presented during the hearing, the parties' post-hearing proposed findings of fact and conclusions of law, the arguments of counsel, and the relevant authorities, the Court finds and concludes as follows:

## II.  FINDINGS OF FACT

1.     Defendant was the sole manager, shareholder, and member of Harplet, an S

---

[4]The March 2020 Order also required Villarreal to review and confirm the names on the spreadsheets corresponding to processing years 2017, 2018, and 2019, and to provide Plaintiff information on any person for whom she prepared a tax return after January 1, 2017, that is omitted from the spreadsheets. (*See* doc. 22 at 4.)

Corporation, through which he operated his tax preparation businesses, Topps Tax and Smart Tax. He had operated an income tax preparation business with locations in the Dallas-Fort Worth area since 2015.

2.   Margarita Mendez and her mother, Esther Mendez, were tax return preparers who prepared tax returns for customers of Topps Tax and Smart Tax for several years.

3.   After Defendant agreed to shut down all his tax preparation stores in 2019, Margarita and Esther decided to hire Defendant's former employees and to open their own tax preparation business. They formed M&M Ventures and named their tax preparation business Prime Tax Services. Margarita obtained an Electronic Filing Identification Number (EFIN) for Prime Tax, and she filed the certificate of assumed named for Prime Tax in Tarrant County, Texas.

4.   Because Margarita and Esther had no experience opening and operating a new business, they asked Defendant to help them with basic start-up tasks, like acquiring office equipment, advertising, remodeling office space, and setting up a phone system. Defendant agreed to assist them with non-tax-preparation activities for Prime Tax and to sell them all the office inventory and client list from his tax preparation businesses.

5.   On September 18, 2019, Defendant, on behalf of Harplet, and Esther, on behalf of Prime Tax, entered into an agreement to sell the entire inventory from Harplet's tax preparation businesses to Prime Tax (Inventory Sale Agreement). They also agreed that Defendant would provide Prime Tax his services for technical support, upgrade, and replacement for one year at $175 a month. The total payment of $41,567.15 ($39,467.15 for the inventory and $2,100 for 12 months of technical support) was to be paid by Prime Tax in installments beginning February 2020.

5

6.      Margarita and Esther attempted to lease office space for Prime Tax, but they were unable to qualify for a lease due to their limited finances, poor credit history, and lack of rental history. Defendant eventually agreed to help them apply for an office lease and to co-sign and personally guarantee the lease for Prime Tax. Defendant reached out to, and had discussions with, a real estate broker about leasing office space for Prime Tax.  Defendant signed a lease application as co-tenant with Margarita for Prime Tax on October 18, 2019.

7.      On November 4, 2019, Defendant and Margarita executed a Shopping Center Lease (Lease), agreeing to lease office space for Prime Tax for tax preparation, tax services, and income tax processing, at an initial rate of $1,700 per month beginning on February 1, 2020. Defendant signed the Lease as President of Prime Tax, and personally guaranteed it. The Lease listed Defendant's contact information, including Smart Tax's former office address, as the contact information for "Tenant", and it identified Margarita as the manager of Prime Tax.

8.      Defendant opened a line of credit of $90,000 or more for Prime Tax, and he, Margarita, and Esther agreed that the funds he paid to get Prime Tax up and running for business would be added to the debt balance owed by Prime Tax. The parties wanted to memorialize their loan agreement, and they signed a standard form "Non-Disclosure Agreement" dated November 8, 2019. Although the agreement contained terms that largely focused on the use and protection of Prime Tax's confidential information, it also referenced the $90,000 loan and identified Defendant as the "Loaner."  The total amount he or Harplet loaned to Prime Tax was $65,232.

9.      From November 2019 through January 2020, Defendant helped Margarita and Esther

6

open Prime Tax for business by, among other things, arranging and paying for Prime Tax's advertising, insurance, rent, and phone system, and overseeing and managing the renovation of its office.

10.     On November 18, 2019, Margarita and Esther visited Defendant's office to enroll and register Prime Tax with Santa Barbara Tax Product Group, LLC (Santa Barbara).  It provides a service to tax return preparers that allows them to collect their fees from a taxpayer's refund amount so that a taxpayer expecting a refund can defer the tax preparation fee payment. After the IRS sends the taxpayer's gross refund directly to Santa Barbara, it deducts its fee and the fees of the tax preparer and remits the taxpayer's net refund directly to the taxpayer. The tax preparation fees are then remitted directly into the tax preparer's designated bank account. Smart Tax or Topps Tax had used Santa Barbara to process tax refunds from its customers and to pay its tax return preparers' commission fees from at least the 2016 through the 2019 filing seasons, and Defendant showed Margarita and Esther how to open an account. Margarita designated a business bank account at BBVA Bank she had previously opened under the name M&M Ventures to receive payments from Santa Barbara for Prime Tax.

11.     In February 2020, Santa Barbara began receiving the refunds from the tax returns prepared by Prime Tax and attempted to pay the tax preparation fees for Prime Tax into the BBVA account that Margarita registered. Because the account was in the name of M&M Ventures, and Prime Tax was listed as the payee for the tax payments from Santa Barbara, the bank returned the payments to Santa Barbara and closed the BBVA account.  When Margarita informed Defendant of the closed bank account and her inability to access the fees to pay Prime Tax's employees and other expenses, the

7

parties authorized Santa Barbara to deposit Prime Tax's fees into Defendant's pre-existing Santa Barbara account. From February 20, 2020 through March 4, 2020, $167,443.62 in tax payment fees for Prime Tax were deposited into Defendant's Santa Barbara account and were then paid into his bank account. Defendant then issued checks from his bank account to pay Prime Tax's employees, rent, and other expenses, and he applied the remaining funds against Prime Tax's debt to him. Margarita was eventually able to reopen a bank account with the correct business name, and after March 3, 2020, Santa Barbara stopped depositing Prime Tax's payments into Defendant's account and began sending all payments directly to the new account.

12.    On February 5, 2020, Chesarae Garza emailed Defendant the 2019 tax paperwork for himself and his wife. Garza's 2019 federal income tax return was filed with an EFIN registered to Prime Tax on April 16, 2020.

13.    On March 2, 2020, Yonnell Medina emailed Defendant her tax documents for the preparation and filing of her 2019 tax return, and Defendant immediately forwarded her email to a Prime Tax employee. Medina's 2019 federal income tax return was filed with an EFIN registered to Prime Tax on March 13, 2020.

14.    On March 7, 2020, Chucky Okoh went to Prime Tax's office and waited while an employee named "Dare" prepared his 2019 tax return. His tax return was filed with the IRS using an EFIN registered to Prime Tax. Okoh paid Dare $499 by check for the tax preparation, but he left the payee section of the check blank because Dare did not know to which bank the check would go. Defendant's name was later added on the payee section of the check, and "Tax doc" was written on the memo line. Okoh did not recognize the handwriting on the check, and he did not know Defendant. When

Defendant received Okoh's check, he assumed it was payment for services performed prior to the October 2019 Order, and he deposited the check into his personal bank account on March 19, 2020.

15.   On March 20, 2020, a 2019 federal income tax return for Fidelia Ikeh was filed and transmitted to the IRS under Prime Tax's EFIN. On April 1, 2020, Defendant deposited a $100 check from Ikeh, which had "Tax Services" on the memo line, into his personal bank account.

16.   In January 2020, one of Defendant's former tax preparation clients, Lisa Recasner, emailed him tax documents for herself and her daughter, and asked him to prepare their 2019 tax returns.  The IRS received the 2019 tax returns for Recasner and her daughter the following month, but neither return identified the tax preparer who prepared the returns. On February 27, 2020, a Prime Tax employee emailed Recasner her 2019 income tax return documents, which identified Margarita as the tax preparer. Recasner emailed Defendant the same day, pointing out that there was a discrepancy with her refund, and that someone else had prepared her tax return. On March 3, 2020, Defendant responded to her email, explaining the discrepancy was due to increased costs for new tax preparation software, but he would reimburse her $200 in fees. On May 11, 2020, Recasner asked Defendant about a letter she received from the IRS regarding her 2019 state taxes, and he identified the documents that she needed to send to the IRS.

17.   On May 15, 2019, Tanya George contacted Defendant, who had prepared her 2017 income tax return in 2018, to get her 2017 AGI, and he responded with the amount. On April 6, 2020, George contacted Defendant to request that he prepare her federal

9

income tax returns for 2018 and 2019, and she emailed him the tax information and documents the following day. George did not know that Defendant had been permanently enjoined from assisting or advising anyone in tax matters. On April 17, 2020, the IRS received George's 2018 and 2019 federal income tax returns, but the returns did not identify the tax preparer. On the same day, George sent a $300 payment via Zelle into Defendant's bank account for the tax preparation. Because Defendant never requested for George to send the payment to him, he sent a $300 check to Prime Tax when he learned of the payment. A Prime Tax employee later emailed George her 2018 and 2019 tax return documents, including invoices from Margarita for tax preparation services. Her tax return documents falsely stated that she made charity donations in 2018 and 2019; however, she never told Defendant about any charitable donations or gifts, and Defendant was the only person she communicated with about the preparation of her 2018 and 2019 tax returns.

18.     In April 2020, Vivian Neskpong met with Defendant, who had prepared and filed her 2018 tax return at Smart Tax, at the same office location. She asked that he, and no one else, prepare the 2019 tax returns for herself, her brother, and her son. Neskpong did not know that Defendant was enjoined from preparing federal income tax returns, but admits that her brother had received a letter stating that he should not go to Defendant for tax preparation. After the 2019 tax returns were prepared, Neskpong met with Defendant at his wife's shop to sign the returns for filing. He told her that the name of the tax preparer was left blank on her return because it was electronically prepared. On April 23, 2020, the IRS received the 2019 tax returns for Neskpong, her brother, and her son. Neskpong later learned that an employee of Prime Tax prepared the 2019 tax

returns, and she was angry at Defendant because he promised that he and no one else would prepare her tax returns.

19.     Between February 7, 2020 and April 6, 2020, Prime Tax and M&M Ventures paid Defendant and his wife $115,500 via cashier's checks. Between March 11, 2020 and September 1, 2020, Margarita withdrew $142,260 in cash from Prime Tax's business account and gave the cash to Defendant.  After Defendant and Margarita reconciled the paperwork regarding the amounts applied to Prime Tax's loan, they determined that Margarita had made overpayments, and he returned three cashier's checks back to her totaling between $47,000 and $67,000.

20.     Defendant sent letters to his customers, explaining that he was enjoined from preparing taxes and included a copy of the permanent injunction, within thirty days of the March 2020 Order.

### III.  CONCLUSIONS OF LAW

Plaintiff argues that Defendant violated the October 2019 Order and March 2020 Order because he "agreed to prepare and file two income tax returns for a former customer" and the returns he prepared were "fraudulent," "prepared (or assisted in the preparation of) additional returns for other customers," and did not send a copy of the permanent injunction to his customers. (doc. 26 at 2-3.) It also claims that Defendant violated both orders because he "has owned or worked with Prime Tax, a tax preparation business, since the Preliminary Injunction went into effect (October 31, 2019); profited from Prime Tax both during the Preliminary Injunction and Permanent Injunction; continues to be on the lease for Prime Tax's office and a party to an agreement with Prime Tax; and he can still loan up to $90,000 to Prime Tax." (doc. 42 at 7.)

"A party may be held in contempt if he violates a definite and specific court order requiring

11

him to perform or refrain from performing a particular act or acts with knowledge of that order."
*Whitfield v. Pennington*, 832 F.2d 909 (5th Cir. 1987) (citing *Sec. and Exch. Comm'n v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)). "The judicial contempt power is a potent weapon" that should not be used unless a specific aspect of the court's order has been "clearly violated." *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's*, 177 F.3d 380, 383 (5th Cir. 1999). "A contempt order is civil in nature if the purpose of the order is (1) to coerce compliance with a court order or (2) to compensate a party for losses sustained as a result of the contemnor's actions." *Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 290-91 (5th Cir. 2002).

To show that civil contempt is warranted, a moving party must establish "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992). Intent is not an element of civil contempt; the issue is whether the alleged contemnor has complied with the court's order. *Whitfield*, 832 F.2d at 913. The standard of proof is clear and convincing evidence, which is "that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (quotations and citations omitted). "If the movant has made the above three-part showing, the burden shifts to the respondent to defend against a civil contempt finding through justifying noncompliance, rebutting the conclusion, demonstrating an inability to comply, asserting good faith in its attempts to comply, or showing mitigating circumstances or substantial compliance." *M.D. bnf Stukenberg v. Abbot*, 509 F. Supp. 3d 683, 704

12

(S.D. Tex. 2020) (citations omitted). [5]

Here, the October 2019 Order went into effect on October 31, 2019, the March 2020 Order went into effect on March 23, 2020, and both orders required certain conduct by Defendant. Plaintiff presented evidence showing that Defendant sold all the inventory and the client list from his tax businesses to Margarita and Esther and loaned them money for some of the start-up costs for Prime Tax. The sale of office equipment and client lists and the extension of credit are not activities prohibited under the October 2019 Order or March 2020 Orders. Although Defendant agreed to provide Prime Tax technical support services for one year, the agreement was entered into on September 19, 2019, over a month before the effective date of the October 2019 Order and six months before the entry of the March 2020 Order, and the contracted services did not relate to tax matters or the preparation of tax returns.

Plaintiff provided evidence that Defendant was the point of contact for Prime Tax, and that he held himself out as a manager or owner of Prime Tax to the landlord and vendors of Prime Tax. It also presented evidence showing that he helped Margarita and Esther set up a tax preparer account with Santa Barbara, and that he temporarily allowed them to use his bank account to receive Prime Tax's preparation fees for approximately three weeks in February and March of 2020. The evidence is insufficient to support a finding, under the clear and convincing standard, that Defendant owned a tax return preparation business or that he was acting as a federal tax return preparer. The payments were used to pay Prime Tax's employees, rent, and other business

---

[5]Even though final judgment has been entered in this case, the March 2020 Order provided that the Court retained jurisdiction to enforce the injunction against Defendant. (*See* doc. 22 at 4-5.) Moreover, it is well-settled law that district courts maintain continuing jurisdiction to modify or enforce injunctions and to enforce judgments through contempt proceedings. *United States v. Revie*, 834 F.2d 1198, 1205 (5th Cir. 1987); *see also Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Enforcement ... through a contempt proceeding must occur in the issuing jurisdiction because contempt is an affront to the court issuing the order.").

expenses, or were applied against Prime Tax's debt to Defendant. While M&M Ventures and Prime Tax issued cashier's checks to Defendant during this period, Margarita and Defendant both testified that those payments were for the repayment of Defendant's loan to Prime Tax, and that Defendant returned overpayments to Margarita after reconciling the loan paperwork.

Plaintiff provided evidence showing that between February 2020 and April 2020, Defendant's former tax preparation customers contacted him about their prior tax returns, and some of them requested tax preparation services, sent him their tax information and documents, and submitted payments to him for tax preparation. The evidence also shows that their tax information and documents were forwarded to employees of Prime Tax, their tax returns were filed with the IRS via an EFIN affiliated with Prime Tax, and the customers received invoices from Prime Tax for tax preparation. The evidence does not establish conduct by Defendant that violates the October 2019 Order or March 2020 Order under the applicable standard. As discussed, the October 2019 Order expressly allowed Defendant to consult and communicate with his former customers about their prior tax returns. There is some evidence of Defendant receiving payments from former customers after their tax returns were filed in 2020, but Defendant testified that he assumed the payments were for tax preparation services rendered before the orders were entered, and that he forwarded those payments to Prime Tax when he learned about them. While Plaintiff claims that the tax returns filed for some of Defendant's former customers did not identify the tax preparer, and that the tax returns of one of his former customers included false charitable deductions, even assuming that the tax returns violated internal revenue laws, the evidence does not rise to the level of clear and convincing proof that Defendant prepared, or assisted in preparing, those tax returns, or that he engaged in conduct that interfered with the proper administration and enforcement of the internal revenue laws.  As discussed, the tax returns at issue were filed under

14

an EFIN registered to Prime Tax.

Because Plaintiff has not presented clear and convincing evidence that Defendant violated the October 2019 Order and March 2020 Order, its request for civil contempt sanctions against Defendant should be denied. *See Martin*, 959 F.2d at 47.[6]

## IV.  RECOMMENDATION

Plaintiff's motions should be **DENIED**.

**SO RECOMMENDED** on this 4th day of October, 2021.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6]In his responses to Plaintiff's motions, Defendant argues that he should be awarded the attorney's fees he incurred in defending against the motions. (*See* docs. 28, 48.) Defendant does not cite any authority in support of his claim for attorney's fees, nor does he provide any documentation supporting a request for a specific amount of attorney's fees.